**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| TRACY CORBIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:17-cv-02813 |
| | § | |
| SOUTHWEST AIRLINES, INC., | § | |
| | § | |
| Defendant. | § | |

---

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

### TO THE HONORABLE JUDGE OF SAID COURT:

Now come the Plaintiff, Tracy Corbin, in the above styled and numbered cause Pursuant to Rule 56 of the Federal Rules of Civil Procedure and files this her Response to Defendant's Motion for Summary Judgment, and in such regard, would show unto the Court as Follows:

## TABLE OF CONTENTS

Page

I.  NATURE AND STAGE OF PROCEEDINGS                                      5

II. STATEMENT OF THE ISSUES TO BE RULED UPON BY THE

    COURT AND STANDARD OF REVIEW                                        8

III. INTRODUCTION AND SUMMARY OF THE ARGUMENT                          8

IV. FACTUAL BACKGROUND                                                  12

V.  ARGUMENTS AND AUTHORITIES

    a.  LACHES                                                          16

    b.  PRIMA FACIE CASE FOR DISCRIMINATION                             5

    c.  RETALIATION                                                     28

    d.  PROVISIONS OF THE RAILWAY LABOR ACT                             30

# TABLE OF AUTHORITIES - CASES

**Case**          **Page(s)**

*Carder v. Continental Airlines*    22
636 F.3d 172, 179 (5th Cir. 2011)

*Fishgold v. Sullivan Drydock & Repair Corp.*    9,18
328 U.S. 275 , 66 S. Ct. 1105, 90 L. Ed. 1230, 18 L.R.R.M. (BNA)
2075, 11 Lab. Cas. (CCH) ¶ 51232, 167 A.L.R. 110 (1946)

*Leonard v. United Airlines, Inc.*    18
972 F.2d 155, 157-58, 15 Employee Benefits Cas. (BNA) 2345,
141 L.R.R.M. (BNA) 2054, 122 Lab. Cas. (CCH) ¶ 10327 (7th Cir. 1992)
(and cases cited therein)

*McDaniel v. Loyola University Medical Center*    22
2014, WL 4269126, *7 (N..D. Ill. 2014)

*Sheehan v. Department of Navy*    21
240 F.3d 1009, 1014, 166 L.R.R.M. (BNA) 2526,
175 A.L.R. Fed. 763 (Fed.. Cir. 2001)

*Stevens v. Tennessee Valley Authority*    17
712 F.2d 1047, 1054-55, 118 L.R.R.M. (BNA) 3201 (6th Cir. 1983)

*Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.*    7, 23
473 F.3d 11, , 20, 181 L.R.R.M. (BNA) 2097, 88 Empl. Prac. Dec.
 (CCH) P 42649, 153 Lab. Cas. (CCH) ¶ 10775 (1st Cir. 2007)

*Ziober v. BLB Res., Inc.* 8    18
39 F.3d 814, , 819 (9th Cir. 2016)

# TABLE OF AUTHORITIES - STATUTES

| Statutes | Page(s) |
|---|---|
| 38 U.S.C. § 4313(a)(1)(B), (2)(B), (3), (4); | 5 |
| 20 C.F.R. §§ 1002.196 to 1002.198, 1002.226 | 5 |
| 38 U.S.C. § 4301 | 6 |
| 38 U.S.C. § 4311(a) as defined in § 4303(2) | 6 |
| 38 U.S.C. § 4302(b); | 8, 9, 19, 23 |
| 20 C.F.R. § 1002.7(b) | 8, 9, 19, 23 |
| 20 C.F.R. § 1002.191 | 9 |
| 38 U.S.C. § 4301 (a) (1-3) | 16 |
| 38 U.S.C. § 4327 (b) | 17, 18 |
| 38 U.S.C. § 4323 (e) | 17, 18 |
| 38 U.S.C. § 4312 | 21, 25 |
| 38 U.S.C. § 4313 | 21 |
| 38 U.S.C. § 4301 (a) (3) | 21, 23 |
| 38 U.S.C. § 4301 (a) (1-3) | 23 |
| 38 U.S.C. § 4311 | 25 |
| 38 U.S.C. § 4323(a)(3)(A) | 31 |
| 20 C.F.R. § 303 | 31 |
| 38 U.S.C. § 4323(b) (1), (3) | 31 |
| 38 U.S.C. § 4323 | 32 |

# I. NATURE AND STAGE OF PROCEEDINGS

## A. Prima Facie Case(s)

a. To support her non-reemployment claim, the fact that Mrs. Corbin (Plaintiff) received incapacitation pay from DFAS (Defense Finance and Accounting Service) establishes the prima facie case that (1) she was injured in the Line of Duty (LOD), (2) she requested reemployment by her civilian employer in a position that made reasonable accommodations for her service-related injury, and (2) her civilian employer (Southwest) refused to reemploy her in a non-flying position (as documented in her Chief Pilot's signed letter).

i. Incapacitation pay is NOT an automatic entitlement for service members injured while on military leave from their civilian employers. In order to receive incapacitation pay, the injured service member must first prove to the DFAS auditors that he/she was injured in the LOD, and then they must prove that they applied for reemployment with their civilian employer,[1] and finally that the civilian employer either could not or would not provide the reasonable accommodation required by § 4313.[2] Injured service members do NOT receive incapacitation pay unless they can prove that <u>they applied for and were refused</u> reemployment by their civilian employers.

ii. It is only at this point that the service member can apply for incapacitation pay, and there is no guarantee that they will receive it. In this case, Mrs. Corbin did not learn that her incapacitation pay application had been approved until August of 2007—four months after she applied to Southwest for a non-flying position!

iii. Mrs. Corbin was at risk of earning NO COMPENSATION at all for those four months due to Southwest's refusal to make reasonable accommodations for her service-related injury.

---

[1] *See* Exhibit 1: AFRCI36-3004 Table A2.1 Item H, produced in plaintiff's initial protocol document production item #10

[2] U.S.C.A. § 4313(a)(1)(B), (2)(B), (3), (4); 20 C.F.R. §§ 1002.196 to 1002.198, 1002.226

iv.    All of these facts are backed up by hard evidence already in the evidentiary record, including extensive phone records, correspondence between Plaintiff and her Reserve unit, and especially Bill Kass's letter documenting Southwest's refusal to reemploy Mrs. Corbin until she could return to the cockpit with a clean medical.

v.    So the fact that Mrs. Corbin received incapacitation pay establishes the prima facie case that she satisfied the DFAS auditors' requirements that she applied for reemployment in a non-flying position, and Southwest refused to reemploy her in a nonflying position, as evidenced by her chief pilot's signed letter.[3]

vi.    To support her claim of discrimination by the taxation of her longevity for her first maternity leave, Plaintiff establishes her prima facie case by pointing to the admissions of Defendant, that similarly-situated civilian pilot Heather Hulen experienced no tax to her longevity date until she requested a 90 day extension to her maternity leave, and it was only that 90 day extension that was taxed.   These undisputed facts establish a prima facie case for cognizable claims under USERRA for discrimination[4] and a hostile work environment.[5]

**B.  Justiciable Issues**

a.    The primary justiciable issue in the non-reemployment claim is whether Mrs. Corbin applied for reemployment promptly in May, 2007 (as Plaintiff contends) or not until December, 2007 (as Defendant contends).

i.    After initially acknowledging this USERRA violation in the February, 2017 meeting[6] Southwest reversed itself and now claims that Mrs. Corbin never requested reemployment until

---

[3]*See* Exhibit 2: Bill Kass's letter C2a190
[4] § 4301
[5] § 4311(a) as defined in § 4303(2)
[6] *See* Exhibit 3: Stilwell deposition & Exhibit 3 to Stilwell deposition that refers to John Freed's admission that "We should have reemployed her."

after recovery from her back surgery in December, 2007.[7]  Against Plaintiff's extensive hard evidence to support her claims,[8] Southwest offers only the declarations of a few sycophant employees, beholding to Southwest for their livelihoods, who claim they can't remember any pertinent details.

ii.    Whether or not Plaintiff promptly requested reemployment in May, 2007 or waited until December, 2007 is a justiciable issue of disputed material fact that can only be resolved at trial.

b.    The primary justiciable issue in the taxation of longevity for maternity leave claim is whether these discriminatory actions were the result of simple clerical error (as Defendant claims) or whether they were the illegal actions of Southwest chief pilots exercising their nearly unbridled discretion to punish military pilots and reward civilian pilots who never took military leave.

i.    Southwest attempts to excuse their admittedly discriminatory actions by pointing to five other members of the class (the class being comprised of pilots who had their longevity dates taxed for their maternity leaves) to allege that their similar disparate treatment of the other five pilots relieves them of culpability for discrimination against the Plaintiff.  However, established USERRA case law clearly states that just because a Defendant does not exercise similar animus towards all members of a class, that does not relieve them of culpability for animus towards a single member of that class.[9]

ii.    Southwest also argues that their discriminatory actions were in compliance with the Collective Bargaining Agreement (CBA). But the USERRA statute supersedes Southwest's

---

[7] *See* Defendant's Motion for Summary Judgment, page 24 lines 11 & 12

[8]*See* Exhibit 4 Extensive phone records, email correspondence between Plaintiff and her Reserve unit (See C3c1590-C3c1591), DFAS pay records; Exhibit 2 Chief Pilot Bill Kass's signed letter (C2a190), etc.

[9] "The failure to treat all members of a class with similar discriminatory animus does not preclude a claim by a member of that class who is so treated." Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc. 473 F.3d 11, 20, 181 L.R.R.M. (BNA) 2097, 88 Empl. Prac. Dec. (CCH) P 42649, 153 Lab. Cas. (CCH) ¶ 10775 (1st Cir. 2007)

CBA[10], so compliance with the discriminatory provisions of their CBA does not excuse violation of USERRA.

## II. STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT AND STANDARD OF REVIEW

Plaintiff argues that the issues presented to the Court to be ruled upon as stated in Defendant's motion for summary judgment should be restated as follows:

(1) Does the equitable doctrine of laches preclude Plaintiff from bringing her claims when Southwest was demonstrably responsible for inducing the delays through Southwest's false replies to Plaintiff's queries on the matter, and Southwest can prove no dispositive prejudice arising from Southwest's self-induced delays?

(2) In spite of Plaintiff's prima facie evidence that she was treated differently than similarly-situated non-military pilots at Southwest—is Defendant entitled to summary judgement?

(3) In spite of Plaintiff's prima facie evidence that she was treated differently based on her membership in the uniformed services, including informing another pilot of his rights under USERRA, is Southwest entitled to summary judgement?

(4) Does the binding arbitration clause of the Railway Labor Act (RLA) render the codified provisions of USERRA which specifically address "deemed income compensation," longevity dates, vacation and sick leave accrual null and void as applied to service members who work in industries regulated by the RLA?

## III. INTRODUCTION AND SUMMARY OF THE ARGUMENT

(1) Plaintiff repeatedly objected to the taxing of her longevity for periods when she was away from work at Southwest to perform military duty. Each time her objections were rebuffed with the half-truth that she was being treated properly in accordance with the CBA (Collective

---

[10] The USERRA Manual §1:7 38 U.S.C.A. § 4302(b); 20 C.F.R. § 1002.7(b)

Bargaining Agreement). The critical piece of information that her supervisors were deliberately omitting, was the fact that "USERRA supersedes contracts, agreements, policies and practices that limit or eliminate any right or benefit under USERRA."[11] By reemploying Plaintiff in the same job but with reduced longevity, Southwest was deliberately violating USERRA's "escalator" principle which assures returning veterans the right to "…the position that the employee would have attained with reasonable certainty if not for the employee's absence due to military service."[12] As stated by the Supreme Court in its post-World War II decision in *Fishgold v. Sullivan Drydock & Repair Corp*, a reemployed veteran "does not step back on the seniority escalator at the point he stepped off. He steps back on at the precise point he would have occupied had he kept his position continuously during the war."[13]

Simply put, the reason for the delay in bringing Plaintiff's claims arose directly from Defendant's malfeasance. Southwest lied to her for years. When Plaintiff finally did discover the truth about her USERRA rights, and shortly thereafter discovered the disparate treatment she had experienced in regards to her first maternity leave claim, Plaintiff acted swiftly and decisively to enforce her USERRA rights.

Southwest has presented absolutely no dispositive evidence of any specific examples of prejudice they have suffered as a result of these self-induced delayed claims.

(2) Southwest extends great discretion to each of their domicile chief pilot supervisors to manage their base in accordance with their interpretation of what is best for Southwest Airlines.[14]

---

[11] The USERRA Manual §1:7 38 U.S.C.A. § 4302(b); 20 C.F.R. § 1002.7(b)
[12] The USERRA Manual §5:4 20 C.F.R. § 1002.191
[13] Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 66 S. Ct. 1105, 90 L. Ed. 1230, 18 L.R.R.M. (BNA) 2075, 11 Lab. Cas. (CCH) ¶ 51232, 167 A.L.R. 110 (1946).
[14] *See* Exhibit 5 (Update from Alan) (C2j1323)

Southwest has admitted that similarly-situated civilian pilot Heather Hulen's longevity was NOT taxed for her initial maternity leave. It was only after Mrs. Hulen requested and was granted an additional 90 days of maternity leave that her chief pilot finally decided that she was showing more loyalty to her new family than she was to her company, so it was at this point that the chief pilot exercised his nearly unbridled discretion and charged Mrs. Hulen's longevity for the extra 90 days of leave.

Plaintiff's chief pilot, (knowing that unlike Mrs. Hulen, Plaintiff often took military leave), exercised his discretion to charge all of Plaintiff's maternity leave so as to deliberately reduce her longevity.

Southwest attempts to dismiss the disparate treatment of civilian pilot Hulen and military pilot Corbin as a self-described administrative error. However, they offer no explanation as to why Mrs. Hulen's longevity was suddenly charged when she requested a 90 day extension to her maternity leave.

These undisputed facts demonstrate a prima facie case of discrimination; "disloyal" military pilots are charged for their entire maternity leaves, while some "loyal" civilian pilots are initially rewarded by not having their longevity taxed while away on maternity leave. It's only when the civilian pilot extends their maternity leave that they cross over into the "disloyal" column and begin to suffer the same treatment as the military pilots.

(3) Southwest has disingenuously offered "administrative error" as their "legitimate, non-discriminatory reason" for its employment actions. The fact that they quickly fixed their "administrative error" when Mrs. Hulen requested additional time off argues persuasively against that theory.

Additionally, Southwest has called Plaintiff into the chief pilot's office on her days off and placed her in fear of losing her job for her ONE AND ONLY fatigue call during her entire seventeen-year career with the airline, which was a direct violation of the FAA's fatigue safety program! Southwest management has subsequently quashed this type of illegal behavior.[15]

Additionally, Southwest initially refused to pay Plaintiff for WORK ALREADY PERFORMED, as punishment for self-identifying herself as fatigued when she was assigned additional flying over and above her assigned block of flying.[16]

(4) Additionally, when her Southwest supervisors harangued her about encouraging a new-hire pilot to continue his military career in the Air National Guard, there was absolutely no legitimate or non-discriminatory reason for chastising her on that point other than their demonstrated animosity towards pilots that took military leave.[17] If Mrs. Corbin had not been a military pilot encouraging another military pilot to continue his military service, her Southwest supervisors would never have sought to intimidate her in the manner in which they did.

(5) Finally, Defendant's assertion that there are no disputed issues of material fact is patently false. On her first maternity claim Plaintiff argues that Southwest's actions were the result of chief pilots exercising almost limitless discretion in rewarding civilian pilots for their loyalty to the company while punishing military pilots for their absences due to military commitments in direct and willful violation of USERRA[18]. Polls conducted by the Southwest Airline Pilots Association (SWAPA) have revealed numbers as high as 77% of their military pilots have felt

---

[15] *See* Exhibit 6: Fatigue Reporting Policy C2b278 and Fatigue Risk Management Commitment C2b277
[16] *See* Exhibit 7 Defendant's Production; Carrasco document; SWA 000275
[17] *See* Exhibit 8 C2d1210 (citing SWAPA poll stating 77% of SWA pilots felt harassed or discriminated against...)
[18] U.S.C.A. Title 38 Chapter 43 § 4301 (a) (1-3)

harassed or discriminated against because of their military service absences from the company.[19] It is Plaintiff's understanding that Defendant disputes these facts.

Plaintiff's second claim, that she was not properly reemployed in a non-flying position after suffering a debilitating back injury, hinges upon whether or not a jury believes that she actually requested reemployment in a non-flying position. In direct contradiction of a signed letter from her chief pilot stating that Southwest would not reemploy Mrs. Corbin until she had no restrictions on her medical certificate, and in direct contradiction of management's admissions that "…we should have reemployed her,"[20] as well as other physical evidence to support her claim such as numerous phone records, Southwest still unaccountably maintains the position that Mrs. Corbin never requested reemployment until she could fly again, after her back surgery.

This issue of material fact, whether Plaintiff requested reemployment in a non-flying position, is the key issue of material facts in this case, and it is certainly disputed by both sides.

## IV. FACTUAL BACKGROUND

### 1. Plaintiff's First Maternity Leave of Absence

In this section Defendant's motion incorrectly states that Plaintiff's longevity was properly taxed 237 days as per the then-current CBA—however Southwest later admitted that only 230 days should have been taxed.[21]

---

[19] *See* Exhibit 8: See C2d1210 (citing SWAPA poll stating 77% of SWA pilots felt harassed or discriminated against…)
[20] *See* Exhibit 3: See Stilwell deposition exhibit containing notes made about John Freed's comments during Feb '17 meeting and Stilwell emails about same meeting C2a24, C2a40
[21] *See* Exhibit 9: Defendant's production document (Nikki Southard email) SWA 000010; and *See* Exhibit 10: Plaintiff's production document (John Freed text) C2a195

However, Plaintiff denies that her longevity was "properly taxed" after discovering that a similarly-situated civilian pilot's longevity was not taxed, (except for the 90 day extension requested later).[22]

### 2. Plaintiff's Second Maternity Leave of Absence

### b. Restoration of Plaintiff's Longevity Under Side Letter 3

Plaintiff wishes to add to the facts as stated in this section of Defendant's motion. After reviewing a late supplemental disclosure document received from Defendant during discovery, Plaintiff discovered that some similarly-situated pilots received nearly $20,000.00 more than Plaintiff received under Side Letter 3. If Plaintiff had been reemployed in a non-flying position as described in her claims, then her award under Side Letter 3 would have been considerably larger than the actual amount received, perhaps even exceeding the $20,000 difference between her award and some other pilots.

### 3. Plaintiff's 2007 Military Leave of Absence and Back Injury

Plaintiff takes issue with a number of facts as mischaracterized and misquoted in Defendant's description in this section of Defendant's motion. Specifically, after suffering her back injury, Plaintiff specifically informed her supervisor that she needed to EXTEND HER CURRENT MILITARY LEAVE. Plaintiff was subsequently notified repeatedly that she was on EXTENDED MILITARY LEAVE, not unpaid medical leave. Defendant cites the Sparks declaration, but then misquotes Sparks, who clearly identified Plaintiff's leave as MILITARY LEAVE in item 16 of his declaration.[23]

Defendant states that under the then-applicable CBA Plaintiff lost longevity while on unpaid medical leave, an irrelevant fact since Plaintiff was on MILITARY leave, (not medical leave),

---

[22] *See* Exhibit 11 Corbin deposition page 122 lines 8-12; page 123 lines 24-25; page 124 line 1
[23] *See* Exhibit 12 Sparks declaration ¶ 16

and on military leave the Plaintiff would not lose either seniority or longevity according to the protections afforded under USERRA. Defendant has subsequently acknowledged this fact[24], and begrudgingly[25] amended Plaintiff's longevity date to restore all but one week of her improperly taxed longevity from 2007.

**Plaintiff's Requests for Reemployment**

Defendant completely misrepresents the evidentiary record when they state, "Plaintiff admits she has no documentation to prove she requested reemployment..." This is patently false. Plaintiff promptly submitted a signed letter from her chief pilot at the time, Bill Kass, stating that it is Southwest policy not to employ pilots with restrictions on their medical certificates[26], (although it is common knowledge that Southwest does employ pilots with restrictions on their medical records, including the same Chief Pilot Bill Kass who lost his medical after an automobile accident but continued to work for the company as a contract negotiator.)

Defendant goes on to cite the irrelevant absence of information on pull sheets while completely ignoring the hard physical evidence of Bill Kass's letter.

### 4. Plaintiff's 2014 Grievance

In January of 2014, Southwest Airlines experienced what Southwest self-described as an "operational meltdown." Southwest issued repeated pleas to their pilot force to please pick up extra flying to help the company dig out of the "meltdown." Mrs. Corbin responded by picking up multiple extra trips, back-to-back that were not on her originally assigned flying schedule.

The second trip in this back-to-back sequence began with a single leg from Houston to Dallas, followed by a scheduled crew rest. Mrs. Corbin was tired from the just-completed prior

---

[24] *See* Exhibit 9 Defendant's production document (Nikki Southard email) SWA 000010 and *See* Exhibit 10 Plaintiff's production document (John Freed text) C2a195
[25] *See* Exhibit 9 Defendant's production document (Nikki Southard email) SWA 000010
[26] *See* Exhibit 2 Bill Kass letter C2a190

trip, but not so tired that she felt she couldn't fly the one leg of the second trip from Houston to Dallas.

By the time she arrived in Dallas she was very fatigued and looking forward to her scheduled rest period before resuming her trip the next day. At this point, although they were transiting a major hub for Southwest airlines with a large number of "Reserve" pilots assigned to that domicile whose only job was to fill in at the last minute when schedules changed—Southwest contacted Mrs. Corbin and attempted to assign her an additional leg of flying. At no time did Southwest make any mention of unaccompanied minors[27], however even if they had it should not have made a difference.

When the FAA instituted their new fatigue management program codified as FAR 117, they put the onus on EACH INDIVIDUAL PILOT to self-determine whether they are safe to fly EACH AND EVERY LEG. If a pilot is too fatigued to fly, the FAA demands that they remove themselves from the cockpit, period.

Mrs. Corbin did exactly the right thing when she removed herself from that cockpit, in fact it was the only approved action she could have taken in accordance with FAR 117. She didn't know there were unaccompanied minors on the additional leg, but if she had, and she had then elected to fly that leg knowing that she was too fatigued to fly safely...she would have been violating the FAA's safety regulations, and subjected herself to possible violation and action against her flying licenses.

This remains the ONLY TIME in her 17 year career with Southwest that Mrs. Corbin removed herself from a cockpit because of fatigue, but it was absolutely the proper thing for her to do.

---

[27] *See* Exhibit 11 Corbin deposition at 194:1-2

The fact that Southwest was able to extract a statement from a sycophant pilot about his thoughts on Plaintiff's fatigue call is entirely irrelevant and in fact in contradiction to FAR 117. Each pilot is responsible for determining their own state of fatigue, it doesn't matter at all what other crewmembers think.

The Defendant's statement that "Plaintiff was not disciplined or treated adversely in any way for calling in fatigued," is simply wrong on its face. She was called into the office on a day off without payment, and initially threatened with non-payment of the leg she flew from Houston to Dallas! She was not terminated, but she was placed in fear of termination, and while she was not directly denied a promotion, it was clear to her after this experience that there was no reason for her to submit her name for any future management opportunities such as check airman.

Most damaging about this entire episode is the fact that the chief pilots "piled on" with accusations of misbehavior in terms of coaching a new hire pilot in ways to "work the system"[28] by using military leave. The ONLY reason this was part of the conversation was because of Plaintiff's military affiliations and her desire to continue to serve current military members. This demonstration of outright hostility towards members of the Air National Guard and Air Force Reserve is in direct conflict with the stated purposes of § 4301 to encourage noncareer service in the uniformed services, provide prompt reemployment of such persons and especially to prohibit discrimination against persons because of their service in the uniformed services.[29]

Mrs. Corbin's grievance cited the applicable sections of the then-current CBA which addressed discrimination based on multiple factors, including VETERAN'S STATUS.[30]

---

[28] *See* Exhibit 11 Corbin deposition page 199 lines 8-18, page 200 lines 6-10
[29] § 4301 (a) (1-3)
[30] *See* Exhibit 13: CBA Section 2.N (Non-discrimination) SWA 000554; *See* Exhibit 14 Grievance SWA 001088

# V. ARGUMENTS AND AUTHORITIES

## a. LACHES

The equitable doctrine of laches remains the last refuge of malfeasors desperate to permanently consummate their offenses against veterans by arguing that they have successfully concealed their misdeeds for so long, that it would be inequitable to hold them accountable now. Unfortunately for Defendants facing USERRA claims, Congress has foreclosed this "inequitable" escape route by specifically decreeing that there shall be NO LIMIT on the period for filing claims[31] under USERRA, and specifically directing courts to exercise their full equitable powers to vindicate the VETERANS,[32] not their employers.

Congress has repeatedly amended the legislation protecting veterans' rights, and EVERY amendment has served to protect and enhance the rights of veterans. Never has Congress amended USERRA or its predecessors in such a way as to deny or take away rights from veterans.

Congress initially amended USERRA's predecessor legislation in 1974 when returning Vietnam veterans faced discrimination from Defendants asserting state law statute of limitations precluded their claims.[33] Congress made it clear that no state statute of limitations would preclude a veteran's legal claims.

When Congress finally enacted a federal four-year catchall statute of limitations (28 U.S.C.A § 1658), they initially failed to exempt USERRA claims from the time limitations of § 1658. The Department of Labor rectified the situation by asking Congress to amend USERRA once again, which they did on October 10, 2008. This amendment included the new section 4327, which contains the unequivocal directive that "..there shall be NO LIMIT on the period for filing

---

[31] § 4327 (b)
[32] § 4323 (e)
[33] Stevens v. Tennessee Valley Authority, 712 F.2d 1047, 1054-55, 118 L.R.R.M. (BNA) 3201 (6th Cir. 1983)

the complaint of claim."[34] The USERRA Manual, § 8:6 states in relevant part, "…the provision arguably divests the courts of discretion to apply the doctrine of laches to USERRA claims."[35]

Additionally, laches is an _equitable_ defense, and USERRA is clear on how Congress intended Courts to exercise their equitable powers. Paragraph (e) of § 4323 is labeled "Equity powers" and states, "The court shall use, in any case in which the court determines it is appropriate, its FULL EQUITY POWERS, including temporary or permanent injunctions, temporary restraining orders, and contempt orders, to vindicate fully the rights or benefits of persons under this chapter."[36] So the court is charged by the USERRA statute to utilize its full equity powers to vindicate the rights of the VETERAN, not their employers!

Like its predecessor, the Veterans Reemployment Rights Act (VRRA), USERRA must be "liberally construed for the benefit of those who left private life to serve their country in its hour of great need."[37]

Additionally, because a significant portion of Plaintiff's claims arise from lost pension benefits, allowance of the laches defense to defeat Plaintiff's claims would have the perverse effect of precluding claims that have not even accrued yet! This is because, "A veteran's claim to recover pension benefits lost while absent from employment for military service does NOT ACCRUE until the veteran retires."[38]

Finally, Defendant argues that Plaintiff unreasonably delayed bringing her claims and that the delay prejudiced Southwest. The reason Plaintiff delayed bringing her claims was because she believed the often repeated falsehoods and half-truths told to her by her Southwest

---

[34] § 4327 (b)
[35] USERRA Manual §8:6
[36] § 4323 (e)
[37] Ziober v. BLB Res., Inc., 839 F.3d 814, 819 (9th Cir. 2016) (quoting Fishgold v. Sullivan Drydock & Repair Corp.)
[38] Leonard v. United Airlines, Inc. 972, F.2d 155, 157-58, 15 Employee Benefits Cas. (BNA) 2345, 141 L.R.R.M. (BNA) 2054, 122 Lab. Cas. (CCH) ¶ 10327 (7th Cir. 1992) (and cases cited therein)

superiors[39] that her longevity was properly taxed in accordance with the CBA, (while omitting the truth that the protective provisions of USERRA supersede any CBA).[40] When Plaintiff finally discovered the lie that had been repeated to her for years, she acted swiftly to enforce her rights, there was no unreasonable delay on her part. It would be inequitable to allow Southwest to profit from sustaining its falsehoods for so long.

Secondly, Southwest has been unable to specify a single reason why the self-induced delay would prejudice its current defense.

Defendant's motion included a statement that all disciplinary actions and/or performance reviews MUST be removed from a pilot's personnel file after two years. However, during discovery Defendant produced documents from Plaintiff's personnel file that were over two years old.[41]

Defendant's motion mentioned several inconsequential people who no longer work for Southwest, but the fact is that none of them were in a position to offer dispositive testimony on this case. In fact Larry Thomas was one of the potential witnesses identified in Defendant's motion as no longer working for Southwest, when in fact Mr. Thomas still appears on the active Southwest pilot list as a Southwest captain flying out of Denver as of the writing of this Answer.

In fact, a substantial number of personnel who were involved in these events still work at Southwest, and none of them have come forward with any dispositive testimony, including the 16 people listed on Exhibit 12.[42]

Bill Kass's automobile accident is also mentioned as a factor, but the motion left out the fact that Bill Kass worked as a management contract negotiator AFTER the automobile accident that

---

[39] *See* Exhibit 11: Corbin Deposition page 211 lines 20-25 and page 212 lines 1-5
[40] The USERRA Manual §1:7  38 U.S.C.A. § 4302(b); 20 C.F.R. § 1002.7(b)
[41] *See* Exhibit 15 SWA 001084 – SWA 001095
[42] *See* Exhibit 16  List of pertinent Southwest employees from 2007 who are still employed at Southwest

allegedly damaged his brain. Not with standing those facts, the letter that Bill Kass signed and sent to Mrs. Corbin's Air Force Reserve unit (stating unequivocally that she would not be rehired until she had no restrictions on her medical certificate) speaks entirely for itself. There is nothing Bill Kass could say to add or subtract from that document—there is no vagueness or ambiguity that needs to be explained. The document speaks for itself. No reasonable jury would conclude anything other than the document was written to document Bill Kass's refusal to reemploy Plaintiff in a non-flying position after she had asked to be reemployed in such a position. All evidence points uniformly to that conclusion.

The DFAS auditors relied upon Bill Kass's letter to document Plaintiff's efforts to achieve reemployment and Southwest's refusal to reemploy her when they authorized disbursement of incapacitation pay, going back to Plaintiff's original request in May, 2007.

## A. Discrimination Under USERRA

Defendant's motion asserts in this section that Plaintiff's claims do not establish a claim of discrimination under USERRA. Obviously the first maternity leave claim is entirely based on the fact that a civilian pilot's longevity was not taxed for her initial maternity leave, while our military Plaintiff's longevity was taxed. This action was a direct violation of USERRA § 4301 (a) (3). Defendant has an extensive and documented history of discrimination and harassment of military pilots.[43] In fact, Plaintiff intends to prove at trial that at the time her claims transpired, Southwest was already under heightened scrutiny by the Department of Labor for their extensive violations of USERRA.[44]

On this particular point § 7:15 of the USERRA Manual states, "Treating employees whose status or activity is protected by USERRA differently from other employees can be a basis for

---

[43] *See* Exhibit 8 C2d1210 (citing SWAPA poll stating 77% of SWA pilots felt harassed or discriminated against...)
[44] *See* Exhibit 17: Plaintiff Timeline C2e1249 lines 5-11

finding unlawful discrimination under the Act."[45]  The manual cites the decision in *Sheehan v. Department of the Navy* in which the court found, "discriminatory motivation under the USERRA may be <u>inferred</u> from…<u>disparate treatment</u> of certain employees compared to other employees with similar work records or offenses."[46]  Plaintiff's claims in this case constitute a classic example of disparate treatment of similarly situated employees.

Of course the failure-to-reemploy claim after Plaintiff suffered her back injury is entirely based upon her rights under USERRA.  A similarly-situated civilian pilot that suffered a similar injury while on a non-military leave would not enjoy these same rights and privileges.  The entire claim rests solely upon Southwest's violation of USERRA's directives to provide up to two years to recuperate from service related injuries[47] and to make reasonable accommodations to reemploy the wounded service member upon their timely application for reemployment.[48]

Certainly Plaintiff's counseling session in which her supervisor summoned her to his office on her day off, put her in fear of termination, threatened to withhold pay for work already accomplished and severely scolded her for educating a new-hire pilot about his USERRA rights constituted a direct violation of USERRA § 4301.[49]

Note the contradiction in Defendant's motion in this section where Defendant incorrectly alludes to a Chief Pilot making offhand comments only "**once**" but in the next paragraph states that "Plaintiff claims she "**routinely heard**" phrases such as, 'You work for Southwest now!' or 'Southwest is your primary job, the Air Force Reserves is secondary!' or 'You don't want to drop many trips, work for the Reserve on your days off!'"  Plaintiff has always maintained that

---

[45] USERRA Manual § 7:15
[46] Sheehan v. Department of Navy, 240 F.3d 1009, 1014, 166 L.R.R.M. (BNA) 2526, 175 A.L.R. Fed. 763 (Fed.. Cir. 2001)
[47] USERRA § 4312
[48] USERRA § 4313 also see C2a130 – C2a147
[49] USERRA § 4301 (a) (3)

she ROUTINELY HEARD these types of discriminatory and harassing comments, as have as many as 77% of her fellow SWAPA military pilots.[50]

Additionally, in this section Defendant's motion improperly cites an outdated and effectively overruled[51] case (*Carder v. Cont'l Airlines, Inc.*) to proffer the notion that USERRA does not recognize a claim for "hostile work environment". In fact, just eight months after the Fifth Circuit issued its incorrect decision in *Carder*, Congress responded by enacting the 2011 amendment to USERRA which clarified that the term "benefit of employment" contained in § 4311(a) encompasses the right not to suffer harassment or a <u>hostile work environment</u> by expanding the definition of "benefit of employment" at § 4303(2) of the Act to include "the terms, conditions, or privileges of employment.[52] In the 2014 case *McDaniel v. Loyola University Medical Center* the court noted that, "in light of the amendment addressing the Fifth Circuit's precise concern, it seems clear that the Fifth Circuit <u>now would find a hostile work environment claim cognizable under USERRA</u>."[53] The court in *Tridico* noted that, "only eight months after the Fifth Circuit issued its decision in *Carder*, Congress enacted the 2011 amendment."[54]

Defendant's contention that a hostile work environment claim is not cognizable under USERRA is clearly wrong, and the facts and evidence[55] in this case speak so loudly and directly to the point that no inference of discriminatory motivation (as stated in *Sheehan*) are required.

**b. Plaintiff's Longevity Taxed Under the Collective Bargaining Agreement**

---

[50] *See* Exhibit 8 C2d1210 (citing SWAPA poll stating 77% of SWA pilots felt harassed or discriminated against…)
[51] USERRA Manual §7:16
[52] USERRA Manual § 7:16
[53] McDaniel v. Loyola University Medical Center, 2014, WL 4269126, *7 (N..D. Ill. 2014)
[54] Tridico, 130 F. Supp. 3d at 31
[55] *See* Exhibit 8 C2d1210 (citing SWAPA poll stating 77% of SWA pilots felt harassed or discriminated against…)

Defendant argues in this section that because Plaintiff's longevity was taxed in accordance with the provisions of the then current CBA, that Plaintiff was treated fairly. In support of this argument Defendant lists five additional civilian pilots who also had their longevity dates taxed for their maternity leaves.

This argument simply ignores the fact that as an act of Congress, USERRA supersedes contracts, agreements, policies and practices that limit or eliminate any right or benefit under USERRA.[56] It is simply irrelevant that Defendant's actions complied with the current CBA, because those same actions VIOLATED USERRA.[57] Defendant cannot simply award themselves a pass for the USERRA violation by claiming that their actions were in compliance with their self-generated lower-ranking CBA, (which incidentally was revised in Side Letter 3 to remove these gender-discriminatory clauses.)

The fact that five additional pilots also had their longevity dates taxed is likewise irrelevant. As the court stated in *Velazquez-Garcia v. Horizon Lines of Puerto Rico*, "The failure to treat all members of a class with similar discriminatory animus does not preclude a claim by a member of that class who is so treated."[58]

In other words, the simple fact that not every chief pilot elected to use their considerable discretion to reward a loyal civilian pilot while punishing a disloyal military pilot does not excuse the fact that one chief pilot did perform that discriminatory action. USERRA does not require a discriminatory action every time a veteran interacts with their supervisor….one blatant example such as this is enough.

---

[56] 38 U.S.C.A. § 4302(b); 20 C.F.R. § 1002.7(b)
[57] § 4301 (a) (1-3)
[58] Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc. 473 F.3d 11, 20, 181 L.R.R.M. (BNA) 2097, 88 Empl. Prac. Dec. (CCH) P 42649, 153 Lab. Cas. (CCH) ¶ 10775 (1st Cir. 2007)

Additionally, Defendant attempts to pass off the lack of Hulen's longevity tax as a simple administrative error, "Ms. Hulen's longevity date was processed incorrectly and she was only taxed 90 days (instead of the 320 days she took)."[59] This mischaracterization glosses over the fact that Ms. Hulen's initial maternity leave was not taxed at all. It was only after Ms. Hulen performed the disloyal act of requesting an additional 90 days of maternity leave that her chief pilot elected to tax her longevity for this disloyal act. The fact that Ms. Hulen's longevity was taxed 90 days instead of 320 days was a deliberate decision by her chief pilot, not the clerical error Defendant would have us believe.

### d. Plaintiff's Re-Employment Based On Her Military Status

This section of Defendant's motion appears to make the illogical argument that veterans have no rights under USERRA until *after* they have been re-employed. This argument completely ignores the employment and reemployment provisions of § 4311 which prohibit employers from denying initial employment or reemployment to qualified veterans, or § 4312's extensive provisions defining specific reemployment rights, or § 4313's extensive designations of employment rights, including the right to convalesce from a service related injury for up to two years (which Southwest blatantly violated in the present case).

Section 4311 (a) specifically states, "A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership..."

---

[59] *See* Defendant's motion page 19

Obviously from the plain meaning of the § 4311 text, it is clear that qualified veterans have the right to employment and reemployment, and these rights must by necessity accrue prior to the veteran's actual engagement on their employer's staff.

In this case, Plaintiff can and will prove that she was discriminated against:[60] first by Southwest's failure to allow her to take the two year convalescent leave stipulated by USERRA,[61] and second when Southwest failed to reemploy her in a nonflying position after her service-related back injury in accordance with § 4313.

### e. Plaintiff met with Chief Pilot Re: Complaints from Fellow Crewmembers

This section of Defendant's complaint includes the completely irrelevant and inaccurate statement that Plaintiff's "co-pilot" (actually captain) complained to Mr. Carrasco about Plaintiff's failure to fly an additional leg. We have already explained why this pilot's opinions about Plaintiff's state of fatigue is irrelevant, and why it was a violation of the FAA's safety management program for Mr. Carrasco to call Plaintiff into his office for her one and only fatigue call during her seventeen year career at Southwest.

This section also attempts to slander Plaintiff by referring to a "pattern of calling sick and/or rejecting flight opportunities." In fact Mrs. Corbin has over 400 hours of sick time in her sick bank, which happens to be considerably more than many Southwest pilots who have not had their sick banks completely depleted by two maternity leaves, back surgery and shoulder surgery. Also, instead of routinely rejecting flight opportunities, Mrs. Corbin routinely volunteers to pick up additional flying and allows herself to be "junior manned" onto trips that are not in her schedule.

---

[60] USERRA § 4311
[61] USERRA § 4312

Defendant omits from this section the fact that Plaintiff was summoned to this meeting in order to scold her for allegedly briefing a new-hire pilot on his USERRA rights. In fact, the childcare issue was pretext to summon her to her supervisor's office and threaten her because of her knowledge and experience gained as a former Air Force Reservist and her willingness to share that knowledge with a fellow veteran. Plaintiff's typed notes after this meeting clearly record her impression that this meeting was called on account of anti-military bias.[62]

This meeting cannot be explained away as a clumsy clerical error or just something we do because it's in our CBA even though it clearly violates USERRA…this meeting was a deliberate and willful violation of USERRA's anti-discrimination provisions. It was a deliberate and willful attempt to intimidate an employee into not sharing USERRA information with other veterans, plain and simple.

### 2. Southwest's Employment Decisions

In this section Defendant claims that Southwest's employment decisions were valid and justified, and citing *Sheehan*, Defendant claims that it would have "taken the adverse action anyway, for a valid reason."

The valid reason given for discriminating against Plaintiff for her maternity leave claim is that the decision was made under the governing CBA or Side Letter 3. As explained extensively *supra*, this argument ignores that fact that USERRA trumps Southwest's CBA and/or Side Letter 3, so Defendant can not excuse their violation of USERRA by claiming they did not violate their self-generated CBA or side letters. Additionally, no valid reason or justification is given for why it was okay to tax a military employee's longevity and not tax a civilian employee's longevity…nor why Southwest would have "taken that action anyway for a valid reason."

---

[62] *See* Exhibit 18, Plaintiff's typed notes C2b283

Next Defendant states that Plaintiff was reemployed following her December 10, 2007 request for reemployment. This statement completely ignores one of the prime justiciable issues in this case, the fact that Southwest did NOT reemploy Plaintiff in a non-flying position when she requested reemployment in May of 2007. The fact that Southwest did reemploy Plaintiff after her December, 2007 request does not excuse their failure to reemploy her in May of 2007.

Finally Defendant states that Mr. Penn and Mr. Carrasco called Plaintiff into their offices to discuss complaints made about Plaintiff's performance and/or her refusal to accept trips. As already discussed *supra*, the "refusal to accept trips" was actually pretext for illegally scolding her for properly complying with the FAA's fatigue risk management program. There was no valid or justified reason to attempt to intimidate her into not complying with the FAA's safety program, and senior management has since issued direct instructions to Southwest's chief pilots that this shall not happen again.[63]

What Defendant omits is the fact that Plaintiff was harangued, threatened and scolded during the second meeting because she shared USERRA information with a new hire pilot. There was no valid or justified reason for attempting to intimidate her into never discussing military matters with a fellow veteran Southwest pilot.

Mrs. Corbin's performance record at Southwest is excellent.[64] She has an extensive sick bank of over 408[65] hours in spite of having her bank emptied on four different occasions for serious medical reasons, and she has only exercised her prerogative to declare herself too fatigued to fly once in her seventeen-year career at Southwest.

---

[63] *See* Exhibit 6 Fatigue Reporting Policy C2b278 and Fatigue Risk Management Commitment C2b277
[64] See Exhibit 19 Plaintiff's Kicktail notes SWA 001431 and SWA 001432
[65] Currently the average sick bank of the top 15 Southwest first officers based in Houston is 366.58, so in spite of having her sick bank completely emptied for serious documented absences 4 times, Plaintiff uses much less sick time than the average senior Southwest first officer based in Houston.

So in fact, Defendant has offered no valid or justified reasons for any of the employment actions at issue here, nor have they offered any valid reason for why they would have presumably "taken the adverse action anyway."

## B. Plaintiff's Claim of Retaliation Under USERRA

There is essentially nothing in this section that has not already been discussed and debunked earlier in this Answer. Defendant appears to be focusing on the term "retaliation" which is certainly applicable in the meetings with Mike Penn and Mr. Carrasco when Southwest retaliated against her for discussing military matters with a new hire pilot by calling her in on a day off, putting her in fear of termination and telling her that they were going to withhold payment for work she had already accomplished (flying the leg from Houston to Dallas).

Whether Defendant wishes to call it "retaliation" for taxing Plaintiff's longevity during her first maternity leave seems irrelevant, it was a violation of USERRA as discussed *supra*. The same is true for Southwest's failure to allow Plaintiff to convalesce up to two years and failure to reemploy her in a non-flying position. It could be referred to as "retaliation" for her absences due to military service commitments, but it was certainly a direct violation of USERRA's protective provisions.

## 1. A. Plaintiff's Engagement in a Protected Activity

In this section Defendant focuses on the four very specific protections afforded by § 4311(b) to persons who take action to enforce protections offered by USERRA, testify in a USERRA proceeding, participate in a USERRA investigation or exercise a right provided for by USERRA.

Defendant argues that because Plaintiff was summoned to her supervisor's office after pilot Williams complained about her, that "there is simply no evidence or even an allegation to

support an inference of retaliation based on Plaintiff's status as a military service member or her engagement in protected activity under USERRA."

Once again, Defendant omits the fact that Plaintiff was harangued at this meeting about her discussion with the jumpseat rider concerning his USERRA rights. Because there was also a discussion about a canceled trip, Defendant asserts the proposition that the supervisors could now engage in any sort of anti-military discriminatory behavior they wished, because they had the pretext of the cancelled trip. In other words, USERRA does not apply, if non-USERRA issues are also discussed at a counseling session.

Obviously the only reason Plaintiff was threatened at his meeting over the military leave issue was because of her honorable record as a uniformed service member, and including a discussion about cancelled trips in the counseling session does not forgive the blatant violation of § 4301 (3) "to prohibit discrimination against persons because of their service in the uniformed services."

## 2. Southwest's Employment Decisions

This section is essentially a rehash of the "valid and justified" section discussed in detail on pages 26 - 28 of this Answer, except that in this section Defendant argues that Southwest's actions were valid and non-retaliatory. As discussed *supra*, Plaintiff has established her prima facie case for each claim put forth, and Southwest has offered no valid or justified reason for any of their employment decisions.

Why would Southwest make the employment decision to tax a military member's longevity for maternity leave but not tax a civilian pilot's longevity? Southwest argues clerical error, but

this falls apart under closer scrutiny when we learn that the civilian pilot's longevity was taxed when she asked for an extension to her maternity leave.

Why did Southwest make the employment decision to pressure Plaintiff into having dangerous and not-necessarily required back surgery instead of allowing her to convalesce for up to two years? What valid and justified reason does Southwest offer for that employment decision...ignorance of USERRA? This is highly unlikely, since the 2 year convalescence provision also appears in Southwest's own employee handbook documents, (in the SWAPA Military Handbook).[66]

Why didn't Southwest reemploy Plaintiff in a non-flying position when she requested it, instead of sending her Reserve unit a signed letter from the chief pilot saying Southwest's policy was to not employ pilots unless they had no restrictions on their medical certificate? What valid and justified reason can Southwest offer for that employment decision? The answer is none...so they change their argument from, "We're sorry we screwed that up and we're going to make it right," to "The Plaintiff is a liar, she never requested reemployment until December, 2007."

Why did Southwest summon Plaintiff to her supervisor's office and threaten her over her military statements to a new hire pilot? What valid and justified reason can Southwest offer for that act of anti-military intimidation? Southwest's answer is that we also illegally counseled her on her one and only fatigue call in her 17-year career, so that justifies the anti-military scolding.


## C. The Mandatory Arbitration Provisions of the Railway Labor Act (RLA)

In this section Defendant argues essentially that veterans who happen to work in industries regulated by the RLA have no rights or remedies under USERRA, that the mandatory arbitration clause of the RLA renders all of Congress's legislation codified within USERRA moot.

---

[66] *See* Exhibit 20: SWAPA's Military Handbook (2003) C2c1152 #17 and (2006) SWA 000956 #17

Interestingly, numerous USERRA cases are cited throughout Defendant's motion which involve Plaintiffs and Defendants who are regulated by the RLA, and those cases were tried in federal courts. This is a spacious argument, obviously nothing within the RLA gives it authority to supersede USERRA.

The claims made in this lawsuit are claims made upon violations of USERRA, not violations of the CBA. Even if Defendant's actions complied with the CBA, and thus the RLA, violations of USERRA are still actionable under the USERRA act.

Additionally, the "deemed income" contributions found within USERRA which require employers to contribute to military members' retirement accounts while they are away on military leave just as if they were still at their civilian employer's place of business is entirely a statutory creation of USERRA. No Collective Bargaining Agreement addresses deemed income, it's not a thing that can be bargained away by any union. The USERRA Manual provides, "A person who believes a private employer, state, or local government has violated his or her rights under USERRA may skip filing a complaint with VETS[67] and proceed directly to court."[68] "USERRA grants the federal courts jurisdiction over lawsuits under the Act against private employers."[69]

Plaintiff erroneously argues that the Court lacks subject matter jurisdiction because those claims are precluded by the mandatory arbitration provision of the RLA. This is simply wrong. Nothing within the RLA attempts to preclude suits brought under the USERRA act, and § 4323 of the Act specifically grants jurisdiction to the federal courts to hear USERRA claims.

---

[67] Veterans Employment and Training Service
[68] USERRA Manual 8:3 citing 38 USCA § 4323(a)(3)(A); 20 C.F.R. § 303
[69] USERRA Manual 8:5 citing 38 USCA § 4323(b) (1), (3)

## VI. CONCLUSION

Plaintiff has easily established her claims as a matter of law and fact, as well as a prima facie case for each claim and the justiciable issues of material fact for each claim. Each claim relied upon in the complaint is firmly grounded in a documented violation of a specific USERRA provision, and each claim is strongly supported by hard evidence already established in the evidentiary record.

Plaintiff respectfully prays that the Court deny Defendant's Motion for summary judgment, and allow this deserving veteran her day in court.

Respectfully submitted,

**BRIN & BRIN, P. C.**
6223 I-10 West
San Antonio, Texas  78201
(210) 341-9711
(210) 341-1854 (Fax)

*/s/ Bruce E. Anderson*

BY:   BRUCE E.  ANDERSON
State Bar No. 01165969
banderson@brinandbrin.com

Sherman F. Morgan
601 Lake Club Drive
Rock Hill, SC 29732
Telephone: 803-981-4180
Sherman.morgan@colonelmorganlaw.com

**ATTORNEYS FOR PLAINTIFF,**
**TRACY CORBIN**

## CERTIFICATE OF SERVICE

I do hereby certify that on the 2nd day of August, 2018, a true and correct copy of the above and foregoing document was furnished to all counsel of record in accordance with the Rules of Civil Procedure via e-filing and email.

Allison Clara Williams
acwilliams@littler.com
State Bar No. 24075108
Federal I.D. No. 1138493
Littler Mendelson, P.C.
1301 McKinney Street, Suite 1900
Houston, Texas 77010
713.951.9400 (phone)
713.951.9212 (fax)

Jason M. Branciforte
jbranciforte@littler.com
DC State Bar No. 429877
(Pro Hac Vice)
Littler Mandelson, P.C.
815 Connecticut Avenue, NW, Suite 400
Washington, DC 20006-4046
202.842.3400 (phone)
202.842.0011 (fax)

*/s/ Bruce E. Anderson*
BRUCE E. ANDERSON